UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

-----------------------------------------------------------------X
:
JAMES E. MCMILLAN III,                            :        MEMORANDUM
                                                  :        AND ORDER
                               Plaintiff,         :
                                                  :        10-CV-2502 (JG) (VVP)
                      -against-                    :
                                                  :
NEW YORK STATE BOARD OF ELECTIONS                 :
and NEW YORK CITY BOARD OF                         :
ELECTIONS,                                        :
                                                  :
                               Defendants.        :
-----------------------------------------------------------------X

A P P E A R A N C E S:

        JAMES E. McMILLAN, III
                1996 Nostrand Avenue
                Brooklyn, NY 11210
                Plaintiff, *pro se*

        ANDREW M. CUOMO
                Attorney General of the State of New York
                120 Broadway
                New York, NY 10271
        By:     Joel Graber
                Attorney for Defendant the New York State Board of Elections

        MICHAEL CARDOZO
                Corporation Counsel for the City of New York
                100 Church Street
                New York, NY 10007
        By:     Stephen Kitzinger
                Attorney for Defendant the New York City Board of Elections

JOHN GLEESON, United States District Judge:

        Plaintiff James E. "Jimmy" McMillan III brings this action, *pro se*, against the

New York State Board of Elections ("State Board") and the Board of Elections in the City of

New York ("City Board") pursuant to 42 U.S.C. § 1983, seeking both monetary and injunctive

relief. The State Board moves to dismiss the complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim. The City Board moves to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. For the reasons stated below, the State Board's motion to dismiss is granted. The City Board's motion to dismiss is granted with respect to claims for damages accruing prior to June 2, 2007. With respect to all remaining claims for damages, the City Board's motion to dismiss is treated as a motion for summary judgment under Rule 56 and is granted. Finally, the City Board's motion to dismiss is granted with respect to McMillan's claim for permanent injunctive relief.

## BACKGROUND

McMillan is the founder and leader of the Rent is Too Damn High party. In 2005 and 2009, McMillan ran for Mayor of New York City, and in 2006, he ran for Governor of New York State. In 2005, his party's full name appeared on the mayoral ballot, but electoral authorities subsequently removed the word "Damn" from the party's name, listing McMillan as a candidate for the "Rent is Too High" party on the 2006 gubernatorial and 2009 mayoral ballots.

McMillan brings this *pro se* action under 42 U.S.C. § 1983 against the State and City Boards, alleging that elimination of the word "Damn" from his party's name in 2006 and 2009 constituted a violation of his federal constitutional rights. Defendants maintain that the party name was altered because the seventeen letters in "Rent is Too Damn High" made it too long to fit on the ballot. They point to provisions of the New York Election Law that authorize abbreviation of party names containing more than fifteen letters "whenever limitations of space so require." *See* N.Y. Elec. Law § 7-104(2) (electronic voting machines); *id.* § 7-106(10) (paper ballots). McMillan, however, asserts that the word "Damn" was excised from the party name for religious reasons. He further alleges that the defendants permitted the names of other parties

containing more than fifteen letters to be printed on the ballot, and that elimination of the word

"Damn" from his own party's name was arbitrary and discriminatory.

McMillan filed his initial complaint on June 2, 2010, seeking damages of $50

million as well as a permanent injunction granting the "Rent is Too Damn High" party a

guaranteed appearance on all future statewide ballots.  McMillan attached a number of exhibits

to his initial complaint.  Also on June 2, McMillan moved for a preliminary injunction requiring

defendants to include the "Rent is Too Damn High" party on the general election ballot in

November of this year.  In response to an order to show cause why the requested preliminary

injunctive relief should not be granted, the State Board submitted both a memorandum of law

and an affidavit.  Similarly, the City Board submitted a memorandum and affidavit, along with

several exhibits.  At oral argument on June 16, 2010, McMillan provided the Court with still

further exhibits that pertained both to the claims asserted in his complaint and to his request for a

preliminary injunction.

Following oral argument, I denied McMillan's motion as moot, as the parties had

settled upon a mutually agreeable abbreviation of the party's name – "Rent is 2 Damn High" – to

be printed on the November ballot should McMillan succeed in collecting the required number of

signatures for an independent nomination under New York's election law.[1]  *McMillan v. New*

---

[1]     On July 1, July 6, and July 13, McMillan renewed his request for preliminary injunctive relief by filing four letter briefs, two of which attached exhibits.  McMillan sought an injunction obliging the defendants to allow "Rent is 2 Damn High" an appearance on the November ballot regardless of whether he satisfied the state's qualification requirements.  At the time of his requests, McMillan had not yet produced a petition with sufficient valid signatures to qualify.  Accordingly, on July 14, 2010, I denied his repeated requests for interim relief, explaining that McMillan had offered no justification for an order allowing him to bypass the petition process.  On July 19, McMillan filed a motion, with exhibits attached, asking the Court to reconsider its July 14 order.  I denied this motion on July 20.  McMillan then asked the Court on August 26 to clarify the July 14 order.  I responded on August 27 with an order explaining, again, that the parties had agreed that "Rent is 2 Damn High" is an appropriate way for the party name to appear on the ballot.  I further explained that this resolution of the preliminary injunction motion did not bear on McMillan's claims for damages based on past conduct.

Since that time, McMillan appears to have satisfied the requirements for appearing on the general election ballot.  As represented to the Court by the State Board at oral argument on September 10, McMillan is

*York State Bd. of Elections*, No. 10-CV-2502 (JG)(VVP), 2010 WL 2607272, at *1 (E.D.N.Y. June 25, 2010).

Meanwhile, on July 1, McMillan filed an amended complaint, seeking $350 million in damages and a permanent injunction requiring defendants to include "Rent is 2 Damn High" on all future ballots. Additional exhibits were attached to the amended complaint. On July 19, the City Board filed a motion to dismiss for failure to state a claim. Along with its notice of motion, the City Board filed a notice to McMillan explaining that written materials outside the pleadings had been submitted to the Court, alerting him that the Court might treat the motion to dismiss as a motion for summary judgment, and encouraging him to submit affidavits and other documentary evidence in support of his claims. Claiming sovereign immunity, the State Board moved on July 21, 2010 to dismiss McMillan's amended complaint for lack of jurisdiction or, in the alternative, failure to state a claim. Again, the State Board submitted with its motion an affidavit and a number of exhibits.

Oral argument was held on the motions to dismiss on September 10, 2010. I informed the parties that, given the number of exhibits and affidavits that had been submitted, I was inclined to treat portions of the defendants' motions as motions for summary judgment. I invited the parties to bring to my attention any facts or evidence relevant to the motions that they believed I did not have before me.

DISCUSSION

A.      *Liberal Construction of a* Pro Se *Plaintiff's Submissions*

Where a plaintiff proceeds pro se, the court must liberally construe his submissions on "the understanding that '[i]mplicit in the right to self-representation is an

---

expected to appear on the November ballot as a candidate for governor on behalf of the "Rent is 2 Damn High" party. *See* Transcript of Proceedings on September 10, 2010 at 6-7 ("Sept. 10 Trans.").

obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)) (alteration in original). In construing McMillan's submissions, I therefore "interpret them 'to raise the strongest arguments that they suggest.'" *See McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

B.      *The State Board's 12(b)(1) Motion to Dismiss*

    1.      *Legal Standard*

    The State Board moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), alleging lack of subject matter jurisdiction in light of the Eleventh Amendment. A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks statutory or constitutional power to adjudicate it. *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996). The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635 (2d Cir. 2005). The court must construe all ambiguities and draw all inferences in favor of the plaintiff. *Marakova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

    The Second Circuit has held that an action is properly dismissed for lack of subject matter jurisdiction where a plaintiff's claims are barred by the Eleventh Amendment. *Madden v. Vermont Supreme Court*, 8 Fed. App'x 128, 129 (2d Cir. 2001). More recently, the Second Circuit has stated in dicta that Eleventh Amendment immunity may not be a matter of subject matter jurisdiction governed by Fed.R.Civ.P. 12(b)(1) when raised in a motion to dismiss, and might be more properly treated as a challenge to the legal sufficiency of the complaint under Fed.R.Civ.P. 12(b)(6). *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71,

77 n. 4 (2d Cir. 2007) (citing *Wisc. Dep't of Corr. V. Schacht*, 524 U.S. 381 (1998)). Without

resolving the issue, the court noted that the distinction is significant in one respect: "while we

must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss

under Fed.R.Civ.P. 12(b)(6) . . . in adjudicating a motion to dismiss for lack of subject-matter

jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside

the pleadings, including affidavits." *Id.* (citations omitted). This distinction does not affect the

outcome here; in evaluating the State Board's assertion of sovereign immunity, I look only to the

pleadings and to state and federal law.

      2.    *Eleventh Amendment Immunity*

      McMillan's Section 1983 claims against the State Board are barred by the

Eleventh Amendment and are therefore dismissed. *See Iwachiw v. New York City Bd. of*

*Elections*, 217 F.Supp.2d 374, 379 (E.D.N.Y. 2002) (dismissing § 1983 claims against the New

York State Board of Elections on the basis of sovereign immunity), *aff'd*, 126 Fed. App'x. 27 (2d

Cir. 2005). The State Board is a state agency for the purposes of the Eleventh Amendment.[2] *Id.*

The Eleventh Amendment bars a suit for money damages or an injunction in federal court

against such a state agency unless either Congress has clearly abrogated the state's immunity or

the state has unequivocally waived its immunity. *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14.

Section 1983 does not abrogate the sovereign immunity of the states, *Quern v. Jordan*, 440 U.S.

332, 342-43 (1979), and the state has not waived its immunity with respect to the claims asserted

by McMillan, *see Edelman v. Jordan*, 415 U.S. 651, 673 (1974) ("[W]e will find waiver only

---

[2]    A court considering whether a putative state entity is an arm of the state for the purposes of the Eleventh Amendment looks to state law to determine the entity's character. *Woods v. Rondout Valley Central School Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006). New York State law defines the State Board as an agency within the New York State executive department. N.Y. Elec. Law § 3-100(1). Furthermore, all four members of the State Board are appointed by the governor. N.Y. Elec. Law § 3-100(1). "That a majority of the Board's members are accountable to the statewide electorate – either directly or through the elected officials who appoint them – strongly indicates that the Board is a state agency . . . ." *Walker v. City of Waterbury*, 253 Fed. App'x. 58, 61 (2d Cir. 2007).

where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)) (alteration in original)).  Accordingly, the State Board's motion to dismiss is granted.

C.      *The City Board's 12(b)(6) Motion to Dismiss*

1.      *Legal Standards*

a.      *Rule 12(b)(6) Motion to Dismiss*

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim is facially plausible only if the pleaded facts permit a court to reasonably infer that the defendant is liable for the alleged misconduct.  *Id.*

b.      *Rule 12(d) Treatment of a Motion to Dismiss as a Motion for Summary Judgment*

A motion to dismiss under Rule 12(b)(6) "presents a pure legal question, based on allegations contained within the four corners of the complaint."  *Goldberg v. Danaher*, 599 F.3d 181, 183-84 (2d Cir. 2010).  When matters outside the pleadings are presented on a Rule 12(b)(6) motion, it is within the court's discretion either to exclude such matters or to treat the motion to dismiss as a motion for summary judgment under Rule 56.  Fed.R.Civ.P. 12(d).  *See also Gryga v. Ganzman*, 991 F.Supp. 105, 107 (E.D.N.Y. 1998) (whether to treat a motion to dismiss as one for summary judgment upon presentation of matters outside the pleadings is a matter of discretion).  When a motion to dismiss is converted into one for summary judgment,

"[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). This requirement is satisfied where each party is given adequate notice that the motion to dismiss may be converted, and no party is taken by surprise. *In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied*, 475 U.S. 105 (1986).

c. *Rule 56 Motion for Summary Judgment*

A motion for summary judgment should be granted if the pleadings and documentary evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *See Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

2. *Statute of Limitations Applied to Claims Accruing Prior to June 2, 2007*

To the extent that McMillan's claims pertain to how the name of his party appeared on the 2006 gubernatorial ballot, they are barred by the applicable statute of limitations and are dismissed pursuant to Rule 12(b)(6). "The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law." *Shomo*, 579 F.3d at 181 (2d Cir. 2009) (citations omitted). *Accord Owens v. Okure*, 488 U.S. 235, 236 (1989). *See also Murawski v. Pataki*, 514 F.Supp.2d 577, 583 (S.D.N.Y. 2007) (applying the three-year statute of limitations to claims challenging the validity of New York State election law and practices). Any claims accruing before June 2, 2007

– three years before McMillan filed his complaint – are therefore time-barred. A claim brought under § 1983 accrues when the plaintiff knows of the alleged injury on which the claim is based. *Jaghory v. New York State Dept. of Educ.*, 131 F.3d 326, 331 (2d Cir. 1997). Accordingly, McMillan can no longer make out a claim for injuries arising from the name used for his party on the November 2006 general election ballot. Therefore, with respect to all claims concerning the 2006 elections, the City Board's motion to dismiss is granted.

        3.     *Claims Accruing After June 2, 2007*

        a.     *Treatment of the Motion to Dismiss as a Motion for Summary Judgment*

With respect to McMillan's remaining claims for damages, which pertain to the appearance of his party's name on the November 2009 ballot, I treat the City Board's motion to dismiss under Rule 12(b)(6) as a motion for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(d). Throughout the course of these proceedings, the parties have provided the Court with documentary evidence that provides a detailed depiction of the events surrounding elimination of the word "Damn" from McMillan's party's name on the 2009 general election ballot. Conversion to a motion for summary judgment is therefore appropriate. *See Thomson v. New York Cent. R. Co.*, 361 F.2d 137, 138-39 (2d Cir. 1966) ("As every phase of the controversy was thoroughly explored in the affidavits in support and in opposition to the motion for a temporary injunction, and all the relevant documents were before the Court below, we think the motion to dismiss under Rule 12(b)(6) should have been treated as a motion for summary judgment."). Furthermore, the parties have had ample opportunity to present all material pertinent to the City Board's motion with respect to McMillan's claims concerning the 2009 election, *see* Fed.R.Civ.P. 12(d), and there is no indication that either party would submit additional relevant materials if given further opportunity. *See In re G. & A. Books, Inc.*, 770 F.2d at 295 ("The

district court's conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form. The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.").

There can be no question that the City Board has been aware, since its motion to dismiss was filed, that the Court might treat the motion as one for summary judgment. Indeed, the City Board attached to its notice of motion a statement addressed to McMillan explaining that very possibility. Notice Mot. Dismiss at 2, July 19, 2010, ECF No. 25. By virtue of that statement, McMillan was also provided on July 19, 2010 with "'unequivocal' notice of the meaning and consequences of conversion to summary judgment." *Hernandez v. Coffey*, 582 F.3d 303, 307-08 (3d Cir. 2009) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983)). Even prior to that notice, throughout these proceedings, McMillan has continually filed with the Court documentary evidence bearing on his claims against the City Board.

Nonetheless – fully aware that "[w]hen a party is proceeding *pro se*, notice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues," *Wali v. Chelsea Plastics*, 351 Fed. App'x 547, 548 (2d Cir. 2009) (internal quotation marks omitted) – I have ensured that McMillan has been afforded ample opportunity to identify additional facts and present additional material in opposition to the City Board's motion. At oral argument on the motions to dismiss, held on September 10, 2010, I informed the parties that I might treat the motions to dismiss as motions for summary judgment, at least in part. Sept. 10 Trans. at 2-3. I explained the differences

between the two types of motion and informed McMillan that if there were any facts not before

me that he wanted to bring to my attention, he should do so.  *Id*. at 2-5, 28.

McMillan stated that he understood, *id.* at 3, and he responded to my invitation to

identify additional evidence not yet in the record.  At the September 10 oral argument, McMillan

asked for production of several items: certain documents[3] as well as a copy of an audio recording

of a meeting of the City Board commissioners held on October 6, 2009, at which McMillan

appeared to discuss his objections to removal of the word "Damn" from his party's name.[4]  *See*

---

[3]     These requests were embodied in letters McMillan presented to the court, which he had sent to defendants on August 24, 2010.  *See* Sept. 10 Trans. at 21-22.  McMillan also filed copies of these letters on September 13.  *See* Mot. Requesting Audiotape at 3, 6, Sept. 13, 2009, ECF No. 37 (attaching letters).  In his August 24 letter to the State Board, McMillan asked for:

> Proof of Notification of (c2006) as required by New York State Election Law;
> (a)   Pursuant to Election Law Section 6-134(2) 'Basin on Non-Compliance';
> (b)   Pursuant to Election Law Section 6-138(3)(b) selecting a different name/emblem.
> (c)   all other notices sent to Jimmy McMillan during the 2006 General Election.

More specifically, McMillan sought:

> 1.   Date notification(s) were sent
> 2.   Conformation Number of Notifications if any
> 3.   Form of delivery < example > (UPS) (Fed-Ex) or (Other…)

In his August 24 letter to the City Board, McMillan requested:

> 1.   Date: Absentee ballots were printed and received by the New York City Board of Elections send all proof.
> 2.   Date: (1st) First Absentee ballots were mailed to Military and Voters.
> 3.   AUDIO, Cassette or CD recording of Commissioners of Elections meeting held on Tuesday, October 6, 2009 at 1:30 P.M. @ Broadway, 6th Floor commissioner's room.
> 4.   Documents that shows plaintiff attempt to change or reduce party name.

The requests made in these letters echoed one made in a motion that McMillan filed on July 19, 2010, asking the court to "ORDER the defendant(s) to send to the Court all 'NOTIFICATIONS' sent to Plaintiff JIMMY McMILLAN what gave them the right under Section (6-138(b) New York State Election Law [sic] to removal of the word 'DAMN' from the Rent Is Too Damn High party name in the (c2006) Gubernatorial Election."  Mot. Requesting Notifications, July 19, 2010, ECF No. 23.

[4]     McMillan renewed this request in a letter to the Court filed on September 13, 2010.  *See*  Mot. Requesting Audiotape, at 1.

Sept. 10 Trans. at 21-22, 34-35.   On September 13, 2010, I ordered the defendants to provide copies of the requested audiotape to McMillan and to the Court.  The City Board complied on September 22.  For reasons discussed fully below,[5] I did not order the defendants to comply with McMillan's remaining discovery requests, as none of the evidence he requested could plausibly have helped McMillan to establish a factual record in support of his claims.

Based on my invitation to McMillan on September 10 to inform me of all evidence not yet before me, and his affirmation that he understood my statements, *see* Sept. 10 Trans. at 2-3, I conclude that the discovery requests articulated at oral argument reflect the full extent of discovery that McMillan wishes to seek in this case.  Accordingly, converting portions of the City Board's motion to dismiss into a motion for summary judgment will not take the parties by surprise or deprive them of an opportunity to present facts not already before the Court.

b.      *The Alleged Constitutional Violations*

Liberally construed, McMillan's allegations regarding the appearance of his party's name on the 2009 general election ballot can be read to make out claims under the First and Fourteenth Amendments of the United States Constitution.[6]  With respect to each of these claims, the City Board's motion for summary judgment is granted.

i.      *Fourteenth Amendment Equal Protection*

McMillan alleges that the City Board intentionally and arbitrarily treated him differently from other similarly-situated candidates.  These allegations suggest a claim under the

---

[5]      *See infra* at notes 8-10.

[6]      In his opposition to the defendants' motions to dismiss, McMillan for the first time makes reference to the New York State Constitution.  Because McMillan's complaint and amended complaint provide no hint of state law causes of action, claims alleging violations of state law are not timely made.  Even if they had been timely made, there appear to be insufficient differences between the cited New York State constitutional provisions and their federal counterparts to salvage the state claims where McMillan's federal constitutional claims fail.

Equal Protection Clause of the Fourteenth Amendment.  Courts "have recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).  In his amended complaint, McMillan alleges that "the defendant(s) admitted to deliberately allowing selective political parties to appear on the ballot with more than (15) fifteen characters in clear violation of New York State Elections Law (7-104(2) [sic].  At the same time they took 'DAMN' out the 'Rent is too damn high' party name and that is a Deprivation of Rights.  I was 'Deprived' from having, and 'Discriminated' against."  Am. Compl. at 1, July 1, 2010, ECF No. 18.

In order to prevail on a "class of one" theory of discrimination, McMillan must show at a minimum: (1) that he was treated differently from other similarly situated individuals, and (2) "either that there was no rational basis for the unequal treatment received, or that the denial of the application was motivated by animus."  *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499-500 (2d Cir. 2001).  Additionally, McMillan must establish that any differential treatment was not only arbitrary, but intentional.  *Giordano v. City of New York*, 274 F.3d 740, 742-43 (2d Cir. 2001).[7]

The documentary evidence establishes as a matter of law that McMillan was treated no differently from other similarly situated individuals with respect to the 2009 general

---

[7]     Plaintiffs in the Second Circuit asserting claims of selective enforcement "traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such different treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bath faith intent to injure a person.'"  *Harlen Assocs.*, 273 F.3d at 499 (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).  However, the Supreme Court's decision in *Olech*, 528 U.S. 562, called into question whether a plaintiff alleging an equal-protection violation must show an illicit motivation, or simply intentional and arbitrary disparate treatment.  *See Hayut v. State University of New York*, 352 F.3d 733, 74 n. 15 (2d Cir. 2003).  The Second Circuit has repeatedly declined to resolve this question.  *Id.*  This ambiguity in circuit law does not affect the analysis in this case because McMillan cannot establish that he was treated differently from other similarly situated individuals.

election ballot.  The evidence further makes plain that, far from acting arbitrarily, the City Board

acted rationally and systematically to shorten all party names exceeding fifteen letters due to

space restrictions on the mayoral ballot.  No party names exceeding fifteen characters were

printed on the 2009 ballot.  *See* Richman Decl., Ex. B, June 10, 2010, ECF No. 12 (image of the

2009 ballot).  In addition, at least two other parties with names that originally exceeded fifteen

characters appeared on the 2009 ballot in abbreviated form.[8]  Furthermore, on multiple

occasions, McMillan received notice similar to the notice provided other candidates that his

party's name was too long, and he was given the same opportunity as other candidates to indicate

a preferred shortened version.  The record includes copies of letters the City Board sent on

September 11, 2009 to three candidates, including McMillan, advising them that their party

names were too long and inviting them to submit shortened versions by September 18, 2009.  *Id.*,

Ex. A.  McMillan himself has submitted an additional letter to the same effect, sent to him by the

City Board on August 21, 2009, which also invited submission of a shortened version of the

party's name within seven days.  *Am. Compl.* at 8-9 (attaching letter).[9]

McMillan did not avail himself of the opportunity twice afforded by the City

Board to select a party name of no more than fifteen letters.  *See* Richman Decl. at para. 7 ("Mr.

McMillan did not contact the Board of Elections to express a preference as to how the name of

---

[8]         McMillan identifies three parties with names containing more than fifteen letters: the "For
Socialism and Liberation" party, the "Socialist Workers" party, and the "Jobs and Education" party.  An affidavit
filed by the City Board explains that the names of two of these parties were abbreviated on the ballot to "Socialism
& Lib" and "Socialist Worker," which contain thirteen and fifteen characters, respectively.  Richman Decl. at para 8.
As for the "Jobs and Education" party, all petitions were filed using the name "Jobs & Education," which is fifteen
characters long and therefore did not require abbreviation.  *Id.* at para. 4 n. 1.  An image of the 2009 ballot, which
includes "Socialism & Lib" and "Socialist Worker" alongside "Rent Is Too High," is consistent with this account.
*See id.*, Ex. B.
[9]         One of McMillan's discovery requests, which I did not grant, asked the State and City Boards to
provide proof of notification sent to McMillan of the Boards' authority to abbreviate his party's name.  *See* Mot.
Requesting Notifications; Mot. Requesting Audiotape at 3, 6 (attaching Aug. 26, 2010 letters to defendants
requesting production of documents).  I decide this motion without granting these requests because they could only
produce further evidence that McMillan was provided both with notice that his party's name was subject to
abbreviation and with an opportunity to create his own abbreviation.   Any additional notice given to McMillan
would undermine rather than support his claims.

the Rent is Too Damn High Party should be shortened.").  McMillan responded to the City

Board's August 21, 2009 letter by informing the City Board on August 24 that he had selected

the unabbreviated, unaltered name "Rent is too damn high."  *See* Am. Compl. at 11 (attaching

letter).  McMillan sent no response at all to the City Board's September 11 letter within the

allotted seven days.  It wasn't until October 5, 2009, long after the deadlines set out in the City

Board's letters had passed, that McMillan attempted to select "Rent Is 2 Damn High" as an

abbreviated party name for appearance on the November 2009 ballot.[10]  *See* Letter Seeking

Prelim. Injunction, at 4-6, July 1, 2010, ECF No. 17 (attaching Oct. 5, 2009 letter and certificate

selecting "Rent Is 2 Damn High" as party name).  Once McMillan missed the August 28, 2009

and then the September 18, 2009 deadlines for submitting an abbreviated version of his party's

---

[10]     Another of McMillan's discovery requests asked the City Board to produce "Documents that
shows [sic] plaintiff attempt to change or reduce party name."  *See* Mot. Seeking Discovery of Audio Tape at 6.  I
did not grant the request because McMillan would be aware of any attempt he made to shorten his party's name
before the September 28, 2009 deadline, and by his own account he made none.  Indeed, McMillan has identified
October 5, 2009 as the date on which he attempted to abbreviate his party's name.  *See* Sept. 10 Trans. at 23
(offering the Court an October 5, 2009 letter while explaining, "So, I agreed to change the name to 2 . . . . They said
it was too late."); Audiotape of Oct. 6, 2009 Commissioners' Meeting, Side B at 5:22-5:47, 8:42-8:51, Sept. 27,
201, ECF No. 40 ("Audiotape") (indicating that Oct. 5, 2009 was the first time that McMillan offered an abbreviated
version of the party name).  McMillan has explained that after receiving the September 11, 2009 letter from the City
Board stating that his party's name was too long, he visited the City Board's Candidate Records Unit instead of
calling the City Board or submitting a letter with an abbreviated version; while at the Candidate Records Unit, he
also did not offer an abbreviated version.  *See* Sept. 10 Trans. at 16-17, 22-23, 30; Audiotape, Side B at 3:58-4:41,
6:45-7:10, 8:42-8:51, 12:13-12:18, Sept. 27, 201, ECF No. 40 ("Audiotape") (McMillan stating he did not believe at
the time he visited the Candidate Records Unit that his party's name needed to be abbreviated).  *See also* Sept. 10
Trans. at 18 (clarifying that what McMillan refers to as the Candidate Services Unit is the Candidate Records Unit).

A letter sent by McMillan to the City Board, dated September 28, 2009, confirms that even at that
time – ten days after the City Board's deadline – McMillan had still not offered an abbreviated version of his party's
name.  *See* Compl. at 9, June 2, 2010, ECF No. 1 (attaching letter).  McMillan sent the letter after receiving from the
City Board a tentative list of candidates expected to appear on the November ballot, which identified McMillan's
party as "Rent Is Too High."  *See* Am. Compl. at 24 (attaching tentative candidacy list).  In his letter, McMillan
demanded to know why the word "Damn" had been taken out of his party's name.  *See* Compl. at 9.  He cited the
provision of the New York Election Law that permits the Board to abbreviate names longer than fifteen letters, but
he did not then offer an abbreviated version, and he did not claim to have offered a shorter version at any time prior.
Instead, McMillan challenged the City Board's determination that the name was too long and questioned whether its
length was the true reason for its abbreviation.  *Id.* ("'The Rent Is Too Damn High Party' made it on the ballot in
2005 in it's [sic] entirely.  Why is there a problem now (in 2009) when you are using the same voting machines? . . .
If it is the word 'DAMN' is getting the Commissioner's [sic] at the NYC Board of Elections upset for 'religious
reasons' then the Commissioner's objection and modification is unconstitutional . . . .").

In light of the evidence before the court and McMillan's own statements concerning the events of
2009, it is clear that McMillan's request for production of documents evidencing his own attempts to shorten his
party's name would not uncover any additional facts in support of McMillan's claims.

name, the City Board reasonably exercised its authority pursuant to N.Y. Elec. Law § 7-104(2)

and created for the ballot its own logically shortened version.[11]

In light of this evidence, no reasonable inference can be drawn that McMillan was

treated differently from other similarly situated individuals, or that he was treated arbitrarily.[12]

Accordingly, the City Board's motion for summary judgment with respect to McMillan's "class

of one" equal protection claim is granted.

### ii. *Fourteenth Amendment Due Process*

McMillan's assertion of arbitrary treatment might conceivably be read also to

allege a violation of procedural due process. Even if such a claim can be found in McMillan's

complaint, it does not survive summary judgment. McMillan has neither alleged nor established

a liberty or property interest secured by the Due Process Clause. An individual has no property

or liberty interest in an elected office. *See Snowden v. Hughes*, 321 U.S. 1 (1944). Nor does he

have such an interest in being elected, *Emanuele v. Town of Greeneville*, 143 F.Supp.2d 325, 333

---

[11]      It has also been suggested by the City Board that, by the time McMillan made his October 5 proposal to shorten his party's name to "Rent Is 2 Damn High," absentee and military ballots had been printed, and the ballot had been certified. *See* Sept. 10 Trans. at 9-10. The evidence in the record tends to support this contention. For instance, at the October 6, 2009 meeting of the commissioners attended by McMillan, the commissioners stated that absentee, military, standby, and emergency ballots had been printed, and that changing those ballots would cost hundreds of thousands of dollars. *See* Audiotape at 170-194. McMillan seems to question these assertions and has included among his discovery requests proof of the dates on which absentee and military ballots were printed and mailed. *See* Mot. Requesting Audiotape at 6. I did not grant this request before deciding the present motion. The reasonableness of the City Board's position would only be enhanced by evidence showing that the Board would have incurred exorbitant costs had it adopted McMillan's proposed abbreviation as late as October 5, 2009. On the other hand, evidence showing that no ballots had yet been printed would provide no factual basis for concluding that McMillan's equal protection rights had been violated. October 5, 2009 was long past the September 18 deadline set by the City Board for McMillan to offer an abbreviated party name. McMillan has made no allegations that this deadline was applied to him arbitrarily, or that it was disregarded with respect to other similarly situated individuals.

[12]      At most, the record suggests that the actions taken by the City Board in the months leading up to the November 2009 election caused some confusion, as McMillan was sent multiple letters on the same day identifying multiple problems with his party's name, or because the Candidate Records Unit did not provide McMillan with clear guidance about how to resolve the problems. *See, e.g.*, June 16 Trans. at 9; Sept. 10 Trans. at 30-33; Audiotape, side B at 17:11-19:32, 23:41-24:19 (McMillan argues, and at least one commissioner agrees, that State Board's methods were sloppy and likely created confusion). However, the record shows that the Board did provide McMillan with notice and multiple opportunities to cure before excising the word "Damn." The record further establishes that such notice was provided in unequivocal if not crystal-clear terms, and that it was at least the same notice as was afforded to other candidates. Proof that the City Board was sloppy or confusing in its methods does not amount to proof that it violated McMillan's constitutional rights.

(S.D.N.Y. 2001), or in appearing on a ballot, *Douglas v. Niagara County Bd. of Elections*, 2007 WL 3036809, at *4 (W.D.N.Y. 2007); *Cornett v. Sheldon*, 894 F.Supp. 715, 725 (S.D.N.Y. 1995). Accordingly, McMillan cannot succeed on a due process claim where the only injury alleged is a thwarted opportunity to be elected.

In any event, even if McMillan had identified a cognizable injury for purposes of a due process claim, the evidence establishes as a matter of law that McMillan was afforded due process. Three factors must be balanced in order to determine whether a plaintiff was afforded due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Under the *Matthews* test, McMillan was afforded adequate procedures before the City Board abbreviated his party's name on the 2009 general election ballot.

First, although McMillan has repeatedly claimed that, by removing the word "Damn" from his party's name, the City Board took his party's name off the ballot completely, *see, e.g.* Sept. 10 Trans. at 25; Transcript of Proceedings on June 16, 2000 at 26-27 ("June 16 Trans."), that is simply not the case. The deprivation complained of is that McMillan's party's name appeared on the ballot in a form that was abbreviated and diluted, recognizable as the same party but not to McMillan's liking. Even if this alleged deprivation constituted a cognizable injury under the Due Process Clause, it is certainly not as severe as removal from the ballot entirely. Second, the evidence establishes that McMillan was provided with notice that his

party's name was subject to abbreviation by the City Board and an opportunity to provide his

own abbreviation. *See* Am. Compl. at 8-9 (letter dated Aug. 21, 2009 informing McMillan that

his party name was too long and notifying him that if he did not file an abbreviated form within

seven days, the City Board would select a name); Richman Decl., Ex. A (letter dated Sept. 11,

2009 to the same effect). In addition, New York state law provides for full judicial review in

expedited proceedings for any aggrieved candidate wishing to challenge the appearance of a

party name on a ballot. N.Y. Elec. Law § 16-104. Although McMillan did not pursue such a

remedy, its availability, along with the notice and opportunity to cure provided by the City Board

prior to the alleged deprivation, satisfies due process. *See Rivera-Powell v. New York City Bd. of

Elections*, 470 F.3d 458, 466-67 (2d Cir. 2006) (finding due process satisfied where plaintiff's

party was removed entirely from the ballot, where plaintiff was provided notice and an

opportunity to be heard before removal and an opportunity to obtain expedited state judicial

review of the removal decision).

Finally, "it is also clear that States may, and inevitably must, enact reasonable

regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). *See also Burdick v. Takushi*,

504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the

conclusion that government must play an active role in structuring elections; 'as a practical

matter, there must be a substantial regulation of elections if they are to be fair and honest and if

some sort of order, rather than chaos, is to accompany the democratic process.'" (quoting *Storer

v. Brown*, 415 U.S. 724, 730 (1974))).

In light of these factors, even if McMillan had alleged violation of an interest

protected by the Due Process Clause, there can be no doubt as a matter of law that McMillan was

afforded due process of law.  Accordingly, the City Board's motion for summary judgment is granted with respect to any due process claim asserted by McMillan.

iii.  *First Amendment Religious Freedom*

In his amended complaint, McMillan alleges that the City Board was "guilty of endorsing [its] Religious Beliefs" when it removed the word "Damn" from his party's name on the 2009 ballot.  On the basis of this allegation, McMillan asserts a claim under the Establishment Clause of the First Amendment.[13]  The Establishment Clause "prohibits government from preferring one religious denomination over another."  *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)).  There is no genuine issue of material fact on this issue, and there is no evidence from which a rational factfinder could conclude that the City Board acted contrary to this prohibition.[14]  Beyond a bare

---

[13]     In its June 10, 2010 memorandum in opposition to McMillan's motion for a preliminary injunction, the State Board treated McMillan's original complaint as having asserted a violation of his Free Exercise rights.  McMillan's submissions cannot plausibly be read to assert a claim under the Free Exercise Clause.  However, even if McMillan had asserted such a claim, it would be entirely unsupported and could not reasonably be resolved in his favor.  The Free Exercise Clause protects individuals from "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion."  *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987).  "Hence it is necessary in a free exercise case for one to show the coercive effect of [government action] as it operates against him in the practice of his religion."  *Abington School District v. Schempp*, 374 U.S. 203, 223 (1963).  McMillan has alleged no such coercion, and he has provided evidence of none.

[14]     The City Board contends that I need not reach this question, because all of McMillan's First Amendment claims fail as a matter of law once his due process claim has been resolved against him.  The City Board relies on the Second Circuit's statement in *Rivera-Powell*, 470 F.3d at 469, that where "a plaintiff challenges a Board of Election[s] decision not as stemming from a constitutionally or statutorily invalid law or regulation, but rather as contravening a law or regulation whose validity the plaintiff does not contest, there is no independent burden on First Amendment rights when the state provides adequate procedures by which to remedy the alleged illegality."  However, McMillan's First Amendment claims are readily distinguishable from those of the plaintiffs in *Rivera-Powell*, and the logic of that decision is not applicable to this case.  As emphasized by the Second Circuit, the plaintiff's First Amendment claim in *Rivera-Powell* was "inextricably intertwined with the question of whether the state afforded her procedurally adequate process."  *Id.*  In other words, the plaintiff claimed that her removal from the ballot constituted deprivation of a protected right without due process of law, and that such deprivation interfered with her and her supporters' First Amendment rights to organize, access the ballot, and vote for the candidate of their choice.  *Id.* at 468.  She "allege[d] no additional deprivation of her First Amendment interests independent from the deprivation that form[ed] the basis of her due process claim."  *Id.*  McMillan's claims, on the other hand, amount to more than allegations that the City Board deprived him of his First Amendment rights because their established procedures for abbreviating party names were inadequate or because they arbitrarily departed from these established procedures.  Rather, McMillan's Establishment Clause claim has an element that clearly

19

allegation that the City Board was motivated by religion, McMillan offers no evidence that the City Board's actions reflected a religious preference.[15]  On the other hand, as discussed above, ample evidence establishes that the City Board acted with a purely secular motive and effect: to accommodate space limitations on the ballot pursuant to its authority under New York electoral law.  *See* N.Y. Elec. Law § 7-104(2), § 7-106(10).  The City Board's ready agreement on June 16 to a "Rent Is 2 Damn High" abbreviation further undermines McMillan's claim that the Board was motivated by a religious animus last year.  Accordingly, the City Board's motion for summary judgment is granted with respect to McMillan's Establishment Clause claim.

iv.    *First Amendment Free Speech and Association*

Construed liberally, McMillan's pleadings might also be read to allege a claim under the First Amendment's free speech and association provisions.  Attached to McMillan's original complaint is a letter he sent to the City Board on September 28, 2009, in which he stated that the Board's modification of his party's name on the 2009 ballot "is unconstitutional by way of the 1st Amendment ---- both Free Speech and Establishment Clauses (Separation of Church and State)."  Compl. at 9 (attaching letter).  Neither McMillan's original complaint nor his amended complaint set out allegations on which a free speech claim might be premised, but at oral argument on his motion for preliminary injunctive relief, McMillan alleged that, by removing the word "Damn" from his party's name, the City Board had undermined his supporters' ability to associate with his party and to cast a meaningful vote.  June 16 Trans. at 27 ("The people go to vote, they didn't see us, they didn't vote for us.").

---

distinguishes it from his Due Process claim: that the City Board acted with religious animus.  Accordingly, McMillan's First Amendment claims cannot be disposed of as summarily as the City Board suggests.

[15]    In a September 28, 2009 letter sent to the City Board, McMillan claims he was "told that the party name 'Rent Is Too Damn High' was cut down for 'RELIGIOUS REASONS.'"  Compl. at 9 (attaching letter).  However, McMillan has never made such an allegation before the Court, and when encouraged to identify any facts or evidence that might support his claims, he did not suggest that any evidence existed to support this alleged statement made over a year ago by one of the defendants.

The First Amendment does not provide candidates with a right to have their political parties listed on election ballots, nor does it invest them with a right to use ballots as forums for political expression. *See Timmons*, 520 U.S. at 362-63; *Dart v. Brown*, 717 F.2d 1491, 1499 (5th Cir. 1983). However, the First Amendment does protect the rights of candidates and their supporters "to organize, access the ballot, and vote for the candidate of their choice." *Rivera-Powell*, 470 F.3d at 468 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983)).

Nonetheless, the evidence before the Court cannot plausibly support an argument that the change in McMillan's party designation impaired the ability of his supporters to cast a meaningful vote or to meaningfully associate with their party and candidate of choice. *See Dart*, 717 F.2d at 1499 (a candidate prohibited from designating party membership on a ballot could make out no First Amendment violation where voters had full opportunity to vote for their candidate of choice and have their vote counted). The evidence allows for no reasonable inference that voters who arrived at the polls hoping to support the "Rent Is Too Damn High" party were so frustrated when confronted with a ballot instead designating McMillan as a candidate for the "Rent Is Too High" party that their fundamental right to cast a meaningful vote or to meaningfully associate was violated. Accordingly, to the extent that McMillan has alleged a violation of his freedom of speech or freedom to associate, the City Board's motion for summary judgment is granted.

4.      *Permanent Injunction*

McMillan seeks a permanent injunction that would guarantee "'Rent is 2 Damn High' a lifetime appearance on and in all State wide ballots and in all voting machines." Am. Compl. at 3. McMillan has offered no basis in law or in logic for allowing him a lifetime pass when it comes to New York law governing ballot access. Dismissal is also appropriate given

plaintiff's inability to identify any imminent and irreparable harm, particularly in light of the parties' agreement upon a mutually acceptable abbreviation of McMillan's party's name on future ballots. *See Fort v. Am. Federation of State, County and Municipal Employees, AFL-CIO*, 9-CV-2275, 2010 WL 1718739, at \*2 (2d. Cir. Apr. 29, 2010) ("Plaintiff's patent inability to demonstrate imminent and irreparable harm further supports the dismissal of their complaint seeking permanent injunctive relief." (citing *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006))). Accordingly, the City Board's motion to dismiss is granted with respect to McMillan's claim for permanent injunctive relief.

CONCLUSION

For the reasons stated above, the State Board's motion to dismiss is granted. The City Board's motion to dismiss is granted with respect to all claims for damages accruing prior to June 2, 2007, and with respect to McMillan's claim for permanent injunctive relief. With respect to all remaining claims, the City Board's motion to dismiss is treated as a motion for summary judgment under Rule 56 and is granted. The Clerk is respectfully directed to enter judgment for the defendants and to close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 15, 2010
      Brooklyn, New York